**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**BLUEFIELD DIVISION**

**ANDY SCOTT KINCAID,**

    **Plaintiff,**

**v.**                                                        **Case No.: 1:17-cv-01096**

**NANCY A. BERRYHILL,
Acting Commissioner of the
Social Security Administration,**

    **Defendant.**

**PROPOSED FINDINGS AND RECOMMENDATIONS**

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Plaintiff's applications for a period of disability and disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. The matter is assigned to the Honorable David A. Faber, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are Plaintiff's Briefs in Support of Judgment on the Pleadings and the Commissioner's Brief in Support of Defendant's Decision, requesting judgment in her favor. (ECF Nos. 11, 12, 15).

For the following reasons, the undersigned **RECOMMENDS** that Plaintiff's motion for judgment on the pleadings be **GRANTED**, to the extent that it requests

remand of the Commissioner's decision pursuant to sentence four of 42 U.S.C. § 405(g); **DENY** Defendant's request to affirm the decision of the Commissioner, (ECF No. 15); **REVERSE** the final decision of the Commissioner; **REMAND** this matter pursuant to sentence four of 42 U.S.C. § 405(g) for further administrative proceedings consistent with this PF&R; and that this case be **DISMISSED**, **with prejudice,** and removed from the docket of the Court.

## I.    Procedural History

In November 2012, Plaintiff Andy Scott Kincaid ("Claimant"), completed applications for DIB and SSI, alleging a disability onset date of April 23, 2009[1] due to "Bad back/bad knees/bad shoulders, Back injury, Arthritis, Depression, carpal tunnel, can not [sic] read and spell good." (Tr. at 243-65, 388). The Social Security Administration ("SSA") denied Claimant's applications initially and upon reconsideration. (Tr. at 155-67, 178-84). Claimant filed a request for an administrative hearing, which was held on August 18, 2015, before the Honorable Jeffrey J. Schueler, Administrative Law Judge (the "ALJ"). (Tr. at 30-70). By written decision dated September 25, 2015, the ALJ concluded that Claimant was not disabled as defined in the Social Security Act from the amended disability onset date of June 25, 2011 through the date of his decision. (Tr. at 21). The ALJ's decision became the final decision of the Commissioner on December 2, 2016 when the Appeals Council denied Claimant's request for review. (Tr. at 1-3).

Claimant timely filed the present civil action seeking judicial review pursuant to

---

[1] Claimant previously filed applications for benefits, which were denied by an Administrative Law Judge on June 24, 2011. As Claimant did not appeal the denial and did not request to re-open the prior applications, the disability onset date for purposes of the instant applications was June 25, 2011, one day after the prior denial. (Tr. at 9-10).

42 U.S.C. § 405(g). (ECF No. 2). The Commissioner subsequently filed an Answer opposing Claimant's complaint and a Transcript of Proceedings. (ECF Nos. 9, 10). Thereafter, Claimant filed Briefs in Support of Judgment on the Pleadings, (ECF Nos. 11, 12), and the Commissioner filed a Brief in Support of Defendant's Decision, (ECF No. 15). Consequently, the matter is fully briefed and ready for resolution.

**II.    Claimant's Background**

Claimant was 41 years old on the date following the prior ALJ's decision and 45 years old on the date of the decision in this case. (Tr. at 245). He completed the ninth grade and communicates in English. (Tr. at 35-36, 387, 419). Claimant previously worked as an assistant automobile mechanic. (Tr. at 60).

**III.    Summary of ALJ's Decision**

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* §§ 404.1520(b), 416.920(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* §§ 404.1520(c), 416.920(c). A severe impairment is one that "significantly limits [a claimant's] physical or mental

3

ability to do basic work activities." *Id.* If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* §§ 404.1520(d), 416.920(d). If so, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must assess the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* §§ 404.1520(e), 416.920(e). After making this determination, the fourth step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* §§ 404.1520(f), 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, in the fifth and final step of the process, that the claimant is able to perform other forms of substantial gainful activity, given the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. §§ 404.1520(g), 416.920(g); *see also McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status for disability insurance benefits through December 31, 2015. (Tr. at 12, Finding No. 1). At the first step of the sequential evaluation, the ALJ found that Claimant had

4

not engaged in substantial gainful activity since June 25, 2011, the day after the prior ALJ's decision. (Tr. 12-13, Finding No. 2). At the second step of the evaluation, the ALJ found that Claimant had the following severe impairments: lumbar spine degenerative disc disease, osteoarthritis of the knees, hypertension, carpal tunnel syndrome ("CTS"), borderline intellectual functioning, major depressive disorder, generalized anxiety disorder, and pain disorder. (Tr. at 13, Finding No. 3). The ALJ also considered Claimant's right shoulder rotator injury status post repair and left shoulder impingement, but concluded that these impairments were non-severe. (Tr. at 13).

Under the third inquiry, the ALJ found that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 13-15, Finding No. 4). Accordingly, the ALJ determined that Claimant possessed:

> [T]he residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a). The claimant can never crawl or climb ladders, ropes, or scaffolds, can occasionally climb ramps or stairs, balance, stoop, kneel, or crouch, and can frequently reach, handle, finger, but only occasionally reach overhead. He should avoid concentrated exposure to chemicals, operational control of hazardous moving machinery, and unprotected heights, should not drive or operate motor vehicles, and needs a low-stress job (defined as having only occasional decision making or changes in the work setting) with only occasional interaction with the public or co-workers.

(Tr. at 15-19, Finding No. 5).

At the fourth step, the ALJ found that Claimant was unable to perform his past relevant work. (Tr. at 19, Finding No. 6). Under the fifth and final inquiry, the ALJ reviewed Claimant's prior work experience, age, and education in combination with his RFC to determine his ability to engage in substantial gainful activity. (Tr. at 19-20, Finding Nos. 7-10). The ALJ considered that (1) Claimant was defined as a younger

individual aged 18-44 on the date following the prior ALJ's decision, (2) he had limited education and could communicate in English; and (3) transferability of job skills was not material to the disability determination. (Tr. at 19-20, Finding Nos. 7-9). Given these factors and Claimant's RFC, with the assistance of a vocational expert, the ALJ concluded that Claimant could perform jobs that existed in significant numbers in the national economy, including unskilled sedentary work as an assembler, table worker, and stuffer. (Tr. at 20, Finding No. 10). Therefore, the ALJ found that Claimant was not disabled as defined in the Social Security Act. (Tr. at 21, Finding No. 11).

## IV.    <u>Claimant's Challenge to the Commissioner's Decision</u>

Claimant raises numerous challenges to the Commissioner's decision. First, he contends that the ALJ failed to properly assess whether he met Listing 12.05C at step three of the sequential evaluation. Claimant argues that the ALJ did not consider three factors, which are indicative of deficits in adaptive functioning: Claimant's past "employment in simple work," his poor grades in school, and his history of getting into fights and getting kicked out of school. (ECF No. 12 at 4-6).

The remainder of Claimant's challenges focus on the ALJ's RFC analysis. Claimant asserts that the ALJ's RFC discussion failed to comport with Social Security Ruling ("SSR") 96-8p because it omitted significant evidence, including the full results of his November 22, 2011 back MRI; a May 1, 2015 right knee MRI; and a June 5, 2015 visit with Dr. Zahir. In addition, it lacked any discussion of Claimant's "nonmedical evidence\daily activities." (*Id.* at 7-8). Claimant further alleges that the ALJ did not explain his reason for rejecting the opinion of Claimant's treating orthopedic surgeon, Robert P. Kropac, M.D., that Claimant could stand for less than two hours and sit for less than six hours in an eight-hour workday. (*Id.* at 8-10). Claimant adds that the ALJ

also failed to explain his conclusory statements that Claimant received conservative treatment, had "routine" problems and impairments, and had "minimal" or "benign" diagnostic results. (*Id.* at 10-12). Finally, Claimant challenges the Commissioner's decision on the basis that the ALJ failed to address his moderate difficulties in concentration, persistence, or pace when formulating the RFC finding. (*Id.* at 12-13).

In response, the Commissioner points to what she considers to be substantial evidence to support the ALJ's RFC assessment and notes that an ALJ is not required to comment on every piece of evidence in the record so long as the analysis is sufficiently thorough to permit meaningful review. (ECF No. 15 at 12-20). The Commissioner contends that the ALJ's RFC assessment complied with SSR 96-8p, correctly analyzed Dr. Kropac's opinion, and fully accounted for Claimant's mental limitations. (*Id.* at 20-31).

## V.    <u>Relevant Evidence</u>

The undersigned has reviewed all of the evidence before the Court. The following evidence is most relevant to the issues in dispute.

### A. Treatment Records

On May 27, 2010, Claimant saw orthopedic surgeon, Matthew Nelson, M.D., complaining of increased bilateral knee pain. (Tr. at 600). Dr. Nelson noted that Claimant had previously received cortisone injections in both knees over eight months earlier. (*Id.*). On examination, Claimant had mild effusion and moderate crepitus, but no erythema or increased warmth. He had a full range of motion and muscle strength, stability to varus and valgus stress testing, and a well-balanced gait. (*Id.*). Claimant was given cortisone injections, encouraged to remain active, and instructed to follow-up on an as-needed basis. (*Id.*).

On July 16, 2010, Claimant saw internal medicine physician, Mustafa Rahim, M.D., complaining of a sudden onset of dizziness. (Tr. at 632). Although Claimant's EKG did not reveal any issues, Dr. Rahim planned for further cardiac testing and started Claimant on Antivert. (*Id.*).

The following month, on August 26, 2010, Claimant again saw Dr. Nelson, this time reporting right shoulder pain. (Tr. at 601). Dr. Nelson gave Claimant a cortisone injection in his right shoulder and planned to order a MRI of Claimant's shoulder. (*Id.*).

Claimant returned to Dr. Rahim on September 16, 2010. (Tr. at 637). Claimant continued to complain of dizziness and symptoms of restless leg syndrome ("RLS"). Claimant's blood pressure was 115/90, but no issues were noted on his physical examination. (*Id.*). Dr. Rahim diagnosed Claimant with suspected RLS, peripheral vascular disease, non-critical carotid stenosis, chronic obstructive pulmonary disease, hypertension, and dizziness in need of further evaluation. (*Id.*). Dr. Rahim ordered an arterial doppler study for Claimant's suspected RLS and a MRI to evaluate Claimant's dizziness. (*Id.*).

On November 15, 2010, Claimant saw Dr. Rahim and did not voice any issues or problems other than trouble sleeping. (Tr. at 640). Claimant's arterial doppler study did not show any significant disease, but a CTA was requested and Claimant was prescribed Ambien. (*Id.*). Claimant returned to Dr. Rahim later that month and was prescribed Ultram. (Tr. at 642).

On January 14, 2011, Claimant saw Dr. Rahim with persistent right shoulder pain. (Tr. at 643). Claimant's hypertension was stable on Vasotec. (*Id.*). Dr. Rahim requested an x-ray, physical therapy, and occupational therapy for Claimant's shoulder. (*Id.*). He was started on the non-steroidal anti-inflammatory drug, Mobic, and his dosage of

Ultram was increased. (*Id.*).

On February 1, 2011, Claimant saw orthopedic surgeon, Philip J. Branson, M.D., for right shoulder pain that had been present for two months. (Tr. at 648). Dr. Branson diagnosed Claimant with right shoulder rotator cuff tendonitis and right hand paresthesia. (Tr. at 649). Claimant was given an injection of lidocaine, Marcaine, and celestone in his right shoulder and referred to physical therapy. (Tr. at 649-50).

The following month, on March 2, 2011, Dr. Branson noted that the injection and physical therapy had not improved Claimant's right shoulder pain, although his hand paresthesia was improved. (Tr. at 651). Dr. Branson ordered a right shoulder MRI, which was taken on March 11, 2011. (Tr. at 751). Upon review of the MRI, Dr. Branson diagnosed Claimant with a small right rotator cuff tear, mild to moderate impingement, and mild arthritis. (Tr. at 757). Dr. Branson repaired the tear arthroscopically on April 8, 2011. (Tr. at 653).

On September 21, 2011, Claimant had lumbar spine x-rays, which showed degenerative changes, but no fracture. (Tr. at 760). However, a lumbar spine MRI taken the following month showed a small to moderate-sized left posterolateral herniated nucleus pulposus at L5-S1 that was narrowing the left neural canal and a small midline disc protrusion at L4-5. (Tr. at 680). In his thoracic spine, Claimant had mild kyphoscolisosis and degenerative changes. (Tr. at 681).

On December 6, 2011, Claimant saw orthopedic surgeon, Dr. Robert Kropac. Claimant's physical examination revealed tenderness in Claimant's lower lumbosacral spine extending downward; a positive straight leg raising test in Claimant's right lower extremity at 90 degrees in the sitting position; 1-2+, symmetric deep tendon reflexes, and intact sensation. (Tr. at 662-63). Claimant had some tenderness to palpation in his

right knee, but there was no effusion or ligamentous laxity. (Tr. at 663). Claimant could heel and toe walk without weakness, and his gait was not antalgic. (*Id.*). Dr. Kropac diagnosed Claimant with a lumbosacral musculoligamentous strain with lower right extremity radiculitis and a right knee strain. (*Id.*). Claimant was continued on Motrin and Lortab and advised to return in three months. (*Id.*).

On December 19, 2011, Claimant saw physician's assistant, Heather Cook, at Bluestone Health Center. Claimant seemed to be doing well overall, but stated that Motrin was no longer effective for his back pain. (Tr. at 665). His blood pressure was 128/76; he was in no acute distress, well developed, and oriented in all spheres; and his gait and stance were normal. (Tr. at 666-67). Claimant was continued on blood pressure medications and a muscle relaxant, Robaxin, and was started on Mobic in place of Motrin. (*Id.*).

On January 23 and April 23, 2012, Claimant saw Dr. Kropac for his three-month follow-up visits. Claimant's physical examinations, diagnoses, and treatment remained the same. (Tr. at 658-61). On May 17, 2012, Claimant saw Ms. Cook for a check-up and medication refills. (Tr. at 668). Claimant was doing well on medications, but wanted to see a different physician for his lower back pain, because the physician that he saw stated that he could not do anything for him. (*Id.*). Claimant's blood pressure was 110/60; he had no erythema in his legs, and his gait and stance were normal. (Tr. at 669-70). Claimant was referred to a neurologist and continued on his medications. (Tr. at 671). Shortly thereafter, on May 23, 2012, Claimant returned to Ms. Cook complaining of RLS symptoms. (Tr. at 672). He stated that he was on Requip for the condition and did well, but had been out of it for over a year. (*Id.*). Claimant's Requip was renewed. (Tr. at 674).

Claimant returned to Dr. Kropac on October 25, 2012. Claimant's physical examination was essentially the same with tenderness in his lower lumbosacral spine, a positive straight leg raising test in his right lower extremity at 90 degrees in the sitting position, and deep tendon reflexes that were 1-2+ and symmetric, with intact sensation. (Tr. at 656-57). Claimant still had some tenderness to palpation and patellofemoral crepitation in his knees, but there was no evidence of swelling, erythema, or deformity. He had no palpable effusion or ligamentous laxity; his McMurray test was negative; he could heel and toe walk without weakness; and his gait was not antalgic. (Tr. at 657). Dr. Kropac's diagnoses remained lumbosacral musculoligamentous strain with radiculitis into the right lower extremity, but Dr. Kropac felt Claimant's knee strains were superimposed on mild degenerative changes. (*Id.*). Dr. Kropac injected a Lidocaine and Celestone mixture into each of Claimant's knees and continued him on Motrin and Lortab. (*Id.*). Dr. Kropac still felt that no other treatment was recommended at that time instructed Claimant to return for re-evaluation in three months. (*Id.*).

On October 31, 2012, Claimant saw Ms. Cook for regular evaluation. He was doing acceptably on medications, but had stopped taking Plavix because it caused him to itch. (Tr. at 676). Claimant's blood pressure was 110/70. His examination was unremarkable. (Tr. at 678). He was continued on medications for RLS, hypertension, and arthritis. (Tr. at 679).

On December 11, 2013, Claimant reported to orthopedic surgeon, Robert C. Pennington, M.D., that he continued to have pain localized in the lateral epicondyle of his right elbow. (Tr. at 708). Claimant denied numbness or tingling, and he was fully ambulatory with a normal gait. (Tr. at 708-09). An examination of Claimant's upper extremities was normal, other than tenderness in his right elbow, and there was no

evidence of swelling, deformity, restriction of rotation or passive motion, collateral laxity, or neurological issues. Dr. Pennington's diagnosis was lateral epicondylitis and possible intraarticular pathology of the lateral elbow. (*Id.*). He recommended that Claimant to undergo arthroscopic surgery for definitive investigation and lateral epicondylar debridement. (*Id.*). Claimant's arthroscopic synovectomy and open lateral epicondylar release surgery in his right elbow was performed on January 9, 2014. (Tr. at 714).

On January 16, 2014, Claimant returned to Dr. Pennington following his right elbow surgery and stated that he was "doing really well" and his deep pain was "gone." (Tr. at 707). Claimant appeared comfortable and alert. (*Id.*). On examination, Claimant lacked ten degrees of full extension in his elbow and had mild swelling, but he had full flexion, unrestricted rotation, and his incision was healing nicely. (*Id.*).

On February 12, 2014, Claimant saw Dr. Rahim for back pain and arthritis, "especially with the change in the weather." (Tr. at 717). His blood pressure was 106/79. He had full flexion in his lumbosacral spine, good lateral bending, negative straight leg raising testing in both positions, no tenderness, and he could squat and stand on his heels and toes without difficulty. (*Id.*). Dr. Rahim started Claimant on Ultram, as it had provided good results for him in the past. (Tr. at 718).

On February 27, 2014, Claimant again saw Dr. Pennington. Claimant was doing well with satisfactory progress in regard to his elbow. (Tr. at 704). He had slight hyperextension in his elbow, but full flexion, unrestricted rotation, and no redness, bruising, or swelling. (*Id.*). He could gradually increase strengthening and hardening of the joint, use common sense as far as increasing activities, and follow up as needed. (*Id.*). Dr. Pennington noted that no further narcotics were prescribed. (*Id.*).

12

On February 25, 2014, Claimant had chest x-rays due to chest pain. The findings were consistent with COPD. Minimal subsegmental atelectasis and/or scarring was seen in his right middle lobe. (Tr. at 764). Later that year, on July 1, 2014, Claimant had nerve conduction studies, which showed moderately severe bilateral carpal tunnel syndrome, the left side slightly worse than the right side. (Tr. at 701).

On October 30, 2014, Claimant saw Dr. Rahim, stating that he was having more spasms in his back and asking for his dosage of Robaxin to be increased. (Tr. at 721). Dr. Rahim increased Claimant's Robaxin and stated that Claimant would continue on a non-narcotic treatment plan. (Tr. at 722). Dr. Rahim discussed that Claimant could pursue investigation, evaluation, and a MRI of his back if he was interested in doing so. (*Id.*).

On November 7, 2014, Claimant saw Dr. Pennington for numbness and tingling of his left hand and elbow pain. (Tr. at 705). On examination, Claimant reported tenderness over his lateral epicondyle. He had diminished sensibility in the median nerve distribution in both hands with mild loss of contour of the tenar eminence that was worse on the left. (Tr. at 706). However, Claimant was moving his elbow and wrist, showed no obvious locking or catching in his fingers, and his examination was symmetric. (*Id.*). Dr. Pennington planned a left carpal tunnel release surgery. (*Id.*). The same month, Claimant saw Dr. Kropac on November 13, 2014; his diagnoses and treatment remained the same. (Tr. at 749).

On December 30, 2014, Claimant followed-up with Dr. Rahim to request medication refills. Claimant's assessed conditions included obstructive chronic bronchitis without exacerbation, hyperlipidemia, occlusion and stenosis of the carotid artery without mention of cerebral infraction, limb pain, osteoarthritis, unspecified polyarthropathy or polyarthritis, other malaise and fatigue, lumbago, tobacco use

disorder, and a vitamin D deficiency. (Tr. at 724-25). He was continued on his prescribed medications; including, enalapril maleate, Mobic, Neurontin, Plavix, Requip, Robaxin, Symbicort, and vitamin D2. (Tr. at 725).

In January and February 2015, Claimant had carpal tunnel release surgery on his left and right extremities, respectively. (Tr. at 710, 712). Also in January 2015, Claimant saw Dr. Kropac and was continued on medications. (Tr. at 746). On February 25, 2015, Claimant saw Dr. Rahim. He complained of dizziness, but stated that while he had not experienced pain following his carpal tunnel release surgery, he had pain now. (Tr. at 726). For hyperlipidemia and carotid stenosis, Claimant was advised to modify his risk factors. (Tr. at 727). Claimant was continued on Symbicort for COPD and his current combination of medications was helping his arthritis and back pain; thus, he was continued on Mobic, Neurontin, Robaxin, Requip, as well as enalapril maleate, Plavix, and vitamin D2. (*Id.*).

On February 27, 2015, Claimant saw Dr. Pennington and showed satisfactory progress following his right carpal tunnel release surgery. (Tr. at 703). His sutures were removed and he was told he could increase activities progressively and return as needed. (*Id.*). Two months later, on April 13, 2015, Claimant saw Dr. Rahim, complaining of pain in his extremities that was worse when he was walking. (Tr. at 729). He denied having any back pain traveling into his lower extremity, recent injury, redness, swelling, or neurological symptoms. (*Id.*). On examination, Claimant did not have any peripheral edema, clubbing, or cyanosis in his extremities; his peripheral pulses were somewhat depressed, but he showed no signs of acute ischemia. (*Id.*). Dr. Rahim found Claimant's symptoms to be suggestive of intermittent claudication/peripheral vascular disease, particularly given that Claimant had risk factors such as hypertension, hyperlipidemia,

carotid stenosis, and he continued to smoke. (Tr. at 730). Dr. Rahim again discussed risk factor modification with Claimant and continued him on Mobic. (*Id.*). Another alternative diagnosis suspected by Dr. Rahim was neuropathy for which Claimant was started on Lamictal. (*Id.*). Claimant was continued on Symbicort for his COPD, and his blood pressure was controlled on Lisinopril. (*Id.*).

On April 14 and May 18, 2015, Claimant saw Dr. Kropac. Claimant noted that his pain was more tolerable with the use of medications, and he was continued on Ultram and a TENS unit. (Tr. at 739-40, 742-43). During his April visit, Claimant also received Naropin and Betamethasone injections in his knees. (Tr. at 743). On May 29, 2015, Claimant saw Dr. Rahim and complained of knee pain, which was worse on the left, and RLS. (Tr. at 731). An MRI of Claimant's knee taken on May 1, 2015 showed a resolution of bursitis, but effusion, a bone bruise, fluid, semi membranous tendons, and degenerative changes were present. (Tr. at 732, 765). Testing for rheumatoid arthritis was planned, and Claimant was referred to orthopedic surgeon, Syed Zahir, M.D., for tendinitis of the knee. (*Id.*). Claimant was to continue Requip for RLS and Plavix. (*Id.*).

On June 5, 2015, Claimant saw Dr. Zahir for bilateral knee pain. (Tr. at 770). On examination, Claimant had a full range of motion of both knees, minimal tenderness, and no ligamentous laxity or effusion. (*Id.*). An MRI showed degenerative changes in the menisci in Claimant's right knee. (*Id.*). Dr. Zahir felt that Claimant had bilateral internal knee derangement and recommended that Claimant "simply wear a knee brace" and continue taking Mobic. (*Id.*). If Claimant continued to have problems, Dr. Zahir would consider arthroscopy. (*Id.*).

On July 7, 2015, Claimant saw Dr. Kropac. Claimant complained of ongoing knee pain, but had no palpable effusion or ligamentous laxity. (Tr. at 735). The range of

motion was symmetric in his knees, and he had normal strength, although there was crepitation on ranging of the knees. (*Id.*). Claimant could heel and toe walk without evidence of weakness, and his gait was not antalgic. (Tr. at 736). Dr. Kropac's diagnoses were probable impingement syndrome in his left shoulder with rotator cuff tendonitis; lumbosacral musculoligamentous strain with lower extremity radiculitis; knee strains superimposed on mild degenerative changes; right elbow lateral epicondylitis status post release surgery; and carpal tunnel syndrome status post release. (Tr. at 737). Claimant was to continue taking Ultram and using his TENS unit. (*Id.*).

### B. Opinion Evidence

On March 1, 2013, Porfirio Pascasio, M.D., assessed Claimant's physical RFC based upon a review of the record. Dr. Pascasio opined that Claimant could perform light level work; including standing, walking, or sitting for six hours, with only occasional postural activities except no climbing of ladders, ropes or scaffolds. (Tr. at 105-06). Dr. Pascasio also assessed that Claimant should avoid concentrated exposure to hazards. (Tr. at 106). Dr. Pascasio's assessment was later affirmed by Fulvio Franyutti, M.D. (Tr. at 135).

On March 20, 2013, psychologist Teresa E. Jarrell, M.A., performed a mental status examination of Claimant. Claimant's posture was observed to be stiff and his gait was slow; he displayed difficulty rising from his seat. (Tr. at 689). However, he drove himself to the appointment, which took approximately 20 minutes. (Tr. at 690). Claimant's social functioning appeared mildly deficient; his speech was normal; he was fully oriented; his thoughts were linear; he was mildly anxious and depressed; his affect appeared restricted; his judgment and immediate memory were normal; his remote memory and concentration were moderately deficient; his persistence was mildly

16

deficient; and his pace was mild to moderately slow. (Tr. at 692, 695). Claimant's full scale IQ score was 68. (Tr. at 693). Ms. Jarrell assessed Claimant with major depressive disorder and generalized anxiety disorder based upon his reported symptoms. (Tr. at 694). She further assessed Claimant with pain disorder caused by both psychological factors and a general medical condition. Ms. Jarrell explained that Claimant's symptoms of depression and anxiety impacted his perception of the pain related to his musculoskeletal conditions by maintaining and exacerbating the pain. (*Id.*). Ms. Jarrell found Claimant to have borderline intellectual functioning based on his intelligence testing and her belief that Claimant's past employment would likely require at least borderline intellectual functioning. (Tr. at 695). Ms. Jarrell listed Claimant's daily activities to include: maintaining his personal hygiene, preparing simple foods, assisting with childcare, managing his medication needs, assisting with laundry, and spending time outdoors. (Tr. at 695). He went online sometimes to use Facebook, but otherwise mainly used the computer to play games. (*Id.*).

On May 21, 2013, David Allen, Ph.D., performed a psychiatric review technique based upon a review of Claimant's records. Dr. Allen opined that Claimant had mild restriction in activities of daily living and moderate restrictions in social functioning and maintaining concentration, persistence, or pace. (Tr. at 103). Dr. Allen found Claimant to be "generally credible" from a psychological standpoint. (Tr. at 105). Claimant was moderately limited in understanding, remembering, and carrying out detailed instructions and maintaining attention and concentration for extended periods, but Claimant could learn and retain simple instructions. (Tr. at 107). According to Dr. Allen, Claimant should avoid tasks that require sustained attention to detail and was probably best suited working with things, rather than people, although the record did not

corroborate Claimant's reports of irritability and impatience with others. (Tr. at 108). John Todd, Ph.D, affirmed Dr. Allen's findings regarding Claimant's mental limitations on November 22, 2013. (Tr. at 132, 136-37).

On August 19, 2015, Dr. Kropac completed a RFC assessment, opining that Claimant could occasionally lift or carry 10 to 20 pounds and frequently lift or carry less than 10 pounds. (Tr. at 773). Dr. Kropac felt that Claimant could stand or walk for less than two hours and sit for less than six hours in an eight-hour workday. (*Id.*). To support his assessment, Dr. Kropac pointed to Claimant's low back pain, lower extremity pain, and bilateral knee pain. He stated that repetitive motion would aggravate Claimant's carpal tunnel syndrome; overhead stretching would aggravate Claimant's left shoulder; and heavy lifting, pulling, and gripping would aggravate Claimant's elbow condition. (Tr. at 773). Dr. Kropac added that Claimant was limited to occasional postural activities except that he could not kneel, crouch, or crawl. (Tr. at 774). In addition, Dr. Kropac stated that Claimant's ability to reach in all directions and his fine and gross manipulation were limited. (Tr. at 775). Dr. Kropac felt that Claimant's subjective complaints were consistent with the findings on his diagnostic testing. (Tr. at 777).

### C. Education Records

Claimant supplied a high school transcript reflecting his ninth and tenth grade academic years. (Tr. at 419-20). According to the records, Claimant attended a public high school in Chicago and passed the minimum proficiency testing to enter high school. (*Id.*). During the first semester of his freshman year, Claimant received a "B" in Physical Education; a "C" in Home Economics; and "Ds" in Introduction to High School English, General Mathematics, and a Vocational/Practical Arts class. (Tr. at 419). In his second semester, Claimant received a "B" in Home Economics; "Cs" in General Mathematics

and Physical Education; a "D" in Vocational/Practical Arts class; and he failed Introduction to English. (*Id.*). In the tenth grade, Claimant was absent 13 days and tardy 8 days; he failed his classes and dropped out of high school. (*Id.*). Notably, Claimant's General Mathematics course was listed as a "Special Education" course, while his Introduction to English course was listed as an "Essential" course, which was defined as including "[c]ourse content at [the] remedial level." (*Id.*).

### D. Prior ALJ's Decision

As noted, Claimant submitted prior applications for DIB and SSI. On June 24, 2011, the prior ALJ determined that Claimant was not disabled under the Social Security Act through the date of the decision. (Tr. at 88). The prior ALJ did not find that Claimant had any severe mental impairments, did not evaluate Listing 12.05C or any other listings pertaining to mental impairments, and did not include any specific mental restrictions in Claimant's RFC. (Tr. at 80-81). The ALJ found that Claimant had the RFC to perform a limited range of sedentary work with 10 to 15-minute breaks at approximately two hour intervals and 12 to 17 days of missed work per year. (Tr. at 81).

### E. Claimant's Statements

During his administrative hearing on August 18, 2015, Claimant stated that he quit school in the tenth grade because he "wasn't learning nothing" and could not read or "spell too good," but the school did not offer any help. (Tr. at 35-36). Claimant stated that he was in a special education classroom for reading, spelling, and mathematics. (Tr. at 36-37). As far as work experience, Claimant previously worked for Pep Boys for approximately five years as a "basic R&R mechanic," which included changing tires and oil. (Tr. at 37). He then worked for other employers doing the same type of work. Claimant stated that his work as an automotive mechanic did not involve reading,

supervising other employees, keeping records, or using a computer. (Tr. at 39-40). Claimant testified that he liked to "stay to [himself]" since he was a child and got into fights at school when kids would make fun of his intellect. (Tr. at 40-41). He testified that he had trouble understanding what people were saying, as well as controlling himself. (Tr. at 41).

Claimant stated that he began having back pain in the 1990's. (Tr. at 42). He noted that pain shot down his right leg into his foot, he could not sleep at night, and if he sat for a while it was hard to get up. (*Id*). Claimant testified that he could not stoop or bend due to pain; he could stand for 30 to 45 minutes before his "legs start[ed] hurting real bad," and if he sat down for an hour, he could "hardly get up." (Tr. at 43). He could lift five to ten pounds and it was hard to lift even a gallon of milk since his shoulder surgeries. (Tr. at 43). Claimant acknowledged that he used a TENS unit on his back and knees, which provided some pain relief. (Tr. at 43-44). He no longer took pain medication because all of the pain clinics were closed down. (Tr. at 44). He did take anti-inflammatories and rested four to five hours per day for pain relief. (Tr. at 44-45). Claimant stated that before his carpal tunnel surgeries, his hands always felt numb and he frequently dropped things. (Tr. at 46). His surgeries "helped some;" his hands were less numb and he did not drop things as frequently. (Tr. at 46-47). However, he still did not pick up his one-year-old child because his wife worried that he would drop the child. (Tr. at 47). He also expressed problems with range of motion, pain, and weakness in his left shoulder and continued to have issues with his right shoulder. (Tr. at 49-50, 52). Claimant stated that he used a cane and knee braces for bilateral knee issues. (Tr. at 50-51). He testified that his right elbow surgery was beneficial, but he still had severe pain when stretching out his arm every "once in a while." (Tr. at 53). According to Claimant,

he "stay[ed] dizzy all the time" due to clogged arteries in his neck, (Tr. at 54), and had RLS at night, which made it difficult to sleep. (Tr. at 55). Claimant stopped taking depression medication because it upset his stomach, made him dizzy, and made his condition worse. (Tr. at 56).

## VI.    Scope of Review

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In Blalock v. Richardson, the United States Court of Appeals for the Fourth Circuit defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

483 F.2d 773, 776 (4th Cir. 1973) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). When examining the Commissioner's decision, the Court does not conduct a *de novo* review of the evidence to ascertain whether the claimant is disabled. *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). Instead, the Court's role is limited to insuring that the ALJ followed applicable Regulations and Rulings in reaching his decision, and that the decision is supported by substantial evidence. *Hays*, 907 F.2d at 1456. If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." *Blalock*, 483 F.2d at 775.

## VII.    Discussion

As noted above, Claimant challenges the ALJ's step three analysis of Listing

12.05C and also challenges the RFC analysis on numerous grounds. Claimant contends that the ALJ's errors render the Commissioner's decision unsupported by substantial evidence.

### A. Listing 12.05C

In his first challenge to the Commissioner's decision, Claimant argues that the ALJ failed to properly compare the evidence of Claimant's impairments to the criteria of Listing 12.05C. In particular, Claimant contends that the ALJ incorrectly interpreted, or superficially considered, records that establish Claimant's deficits in adaptive functioning that manifested in the developmental period; such as, his past employment in "simple work;" his poor performance in school, which culminated in him dropping out of school in the tenth grade; and his history of dysfunctional relationships, exemplified by numerous schoolyard fights. (ECF No. 12 at 4-6). According to Claimant, given the ALJ's finding that Claimant satisfied two of the three prongs required to meet Listing 12.05C, the ALJ's failure to correctly assess the third and final prong—Claimant's adaptive functioning—was highly prejudicial.

At the third step of the sequential evaluation process, a claimant should be found disabled when his or her impairments meet or medically equal an impairment included in the Listing. The Listing describes "for each of the major body systems, impairments which are considered severe enough to prevent a person from doing any gainful activity." *See* 20 C.F.R. § 416.925. The Listing is intended to identify those individuals whose mental or physical impairments are so severe that they would likely be found disabled regardless of their vocational background; therefore, the SSA intentionally set the criteria defining the listed impairments at a higher level of severity than that required to meet the statutory definition of disability. *Sullivan v. Zebley,* 493 U.S. 521, 532, (1990).

However, "[f]or a claimant to show that his impairment matches a [listed impairment], it must meet *all* of the specified medical criteria." *Id.* at 530. The claimant bears the burden of production and proof at this step of the disability determination process. *Grant v. Schweiker,* 699 F.2d 189, 191 (4th Cir. 1983).

Section 12.00 of the Listing pertains to Mental Disorders, which in 2015 were arranged in nine diagnostic categories, including listing 12.05 (Intellectual Disability[2]). 20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 12.00. According to the regulations:

> The structure of the listing for intellectual disability (12.05) is different from that of the other mental disorders listings. Listing 12.05 contains an introductory paragraph with the diagnostic description for intellectual disability. It also contains four sets of criteria (paragraphs A through D). If [a claimant's] impairment satisfies the diagnostic description in the introductory paragraph and any one of the four sets of criteria, [the SSA] will find that [the] impairment meets the listing.

*Id.*

Therefore, to qualify for intellectual disability under listing 12.05C, which is often referred to as the listing for "mild mental retardation," Claimant must establish that he has an intellectual impairment that satisfies both the *diagnostic description* of intellectual disability and the *severity criteria* set forth in paragraph C. The diagnostic description of intellectual disability, sometimes called the first prong of the listing, is "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period, i.e., the evidence demonstrates or supports onset of the impairment before age 22." 20 C.F.R. Part 404, Subpart P, App'x 1 § 12.05. The severity criteria of paragraph C, which constitute the

---

[2] The term "mental retardation" was replaced with "intellectual disability" effective September 3, 2013. 78 Fed. Reg. 46,499–46,501 (Aug. 1, 2013). However, this change "does not affect the actual medical definition of the disorder or available programs or service," *Id.* at 46,500. Moreover, the structure of the listing, its diagnostic description, and its severity criteria were unchanged.

next two prongs of the listing, include: "a valid verbal, performance, or full scale IQ of 60 through 70" and "a physical or other mental impairment imposing an additional and significant work-related limitation of function." *Id.*

While intellectual functioning can be measured, in part, by standardized intellectual quotient (or "IQ") testing, the first prong of Listing 12.05, "[a]daptive functioning refers to more than simply an IQ score or grades in school." *Dearry v. Astrue*, No. 2:11CV00027, 2012 WL 1165332, at *5 (W.D. Va. Apr. 9, 2012); *Salmons v. Astrue*, No. 5:10CV195-RLV, 2012 WL 1884485, at *2 (W.D.N.C. May 23, 2012). According to the American Psychiatric Association:

> Deficits in adaptive functioning ... refer to how well a person meets community standards of personal independence and social responsibility, in comparison to others of similar age and sociocultural background. Adaptive functioning involves adaptive reasoning in three domains: conceptual, social, and practical. The *conceptual (academic) domain* involves competence in memory, language, reading, writing, math reasoning, acquisition of practical knowledge, problem solving, and judgment in novel situations, among others. The *social domain* involves awareness of others' thoughts, feelings and experiences; empathy; interpersonal communication skills; friendship abilities; and social judgment, among others. The *practical domain* involves learning and self-management across life settings, including personal care, job responsibilities, money management, recreation, self-management of behavior, and school and work task organization, among others. Intellectual capacity, education, motivation, socialization, personality features, vocational opportunity, cultural experience, and coexisting general medical conditions or mental disorders influence adaptive functioning.

Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* (5th Ed. 2013) at pg. 37.[3] "Deficits in adaptive functioning can include limitations in areas such

---

[3] The SSA recognizes four major professional organizations that each has its own definition of intellectual disability. All four definitions include significant deficits in adaptive functioning as an element of the condition although the organizations differ in the required date of onset and the method of measurement. *See* Technical Revisions to Medical Criteria for Determinations of Disability, 67 Fed.Reg. 20,018–01, at 20,022 (Apr. 24, 2002). The American Psychiatric Association's definition, while not specifically adopted by the SSA, is generally accepted and recognized in the field of mental health.

as communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety." *Jackson v. Astrue*, 467 F. App'x 214, 218 (4th Cir. 2012) (citing *Atkins v. Virginia,* 536 U.S. 304, 309 n. 3 (2002)); *Hinkle v. Comm'r Of Soc. Sec.*, No. 3:14-CV-41, 2015 WL 2170034, at *6 (N.D.W. Va. May 8, 2015). Because intellectual disability is a lifelong condition, a claimant must show that the deficits in adaptive functioning manifested during the formative years, predating age twenty-two. *Herron v. Astrue*, No. 5:12-CV-44, 2012 WL 4747270, at *9 (N.D.W. Va. Aug. 24, 2012) (citing *Luckey v. U .S. Dept. of Health and Human Svcs.,* 890 F.2d 666, 668 (4th Cir. 1989)).

As many courts have recognized, Listing 12.05C "does not expressly define 'deficits in adaptive functioning.'" *Rothrock v. Colvin*, No. 1:13CV497, 2016 WL 1175189, at *6 (M.D.N.C. Mar. 23, 2016). Whether a claimant's adaptive deficits fulfill the diagnostic description contained in the first prong of the listing is "a fact-specific inquiry and must be determined on a case-by-case basis." *Odoms v. Colvin*, 194 F.Supp.3d 415, 422–23 (W.D.N.C. 2016) (citation omitted). Although this inquiry has "few bright line rules," courts in this circuit have pointed to multiple factors that tend to establish the presence of deficits in adaptive functioning with an early onset. *See Weedon v. Astrue,* Case No. 0:11–2971–DCN–PJG 2013 WL 1315311, at *5 (D.S.C. Jan. 31, 2013) (collecting cases). For example, if a claimant has previously been diagnosed with mental retardation, courts are inclined to find that the claimant had an earlier onset of deficits in adaptive functioning. *Conyers v. Astrue,* No. 4:11–CV–00037–D, 2012 WL 3282329, at *8-9 (E.D.N.C. June 29, 2012). In addition, evidence of a claimant's illiteracy, *Rivers v. Astrue,* No. 8:10–cv–314–RMG, 2011 WL 2581447, at *4 (D.S.C. June 28, 2011); evidence that a claimant has never lived independently, *Holtsclaw v. Astrue,* No.

1:10CV199, 2011 WL 6935499, at *5 (W.D.N.C. Dec.30, 2011); and evidence that a claimant is dependent on others, or has never been responsible to care for others, *Salmons v. Astrue,* No. 5:10-CV-195–RLV, 2012 WL 1884485, at *7 (W.D.N.C. May 23, 2012), have all been considered proof of deficits in adaptive functioning that manifested before age 22.

Another well-recognized indicator of limitations in adaptive functioning manifesting in the developmental years is poor academic performance. *Smith v. Astrue,* 2011 WL 846833, at *3 (D.S.C. Mar. 7, 2011); *Salmons v. Astrue,* 5:10-cv-195-RLV, 2012 WL 1884485, at *7 (W.D.N.C. May 23. 2012) ("[F]unctional academic skill is the primary measure of deficits in adaptive functioning before age 22.") Accordingly, school records showing ongoing problems in the classroom are important evidence of early-onset deficiencies in functioning that should not be undervalued when assessing the diagnostic description of intellectual disability. In addition, work history is a factor to consider, as absent or unstable job performance may indicate deficits in adaptive functioning; although, the existence of a stable work history, by itself, is not determinative of the inquiry. *See Salmons,* 2012 WL 1884485, at *2-3 (citing *Luckey v. U.S. Dep't of Health & Human Servs.,* 890 F.2d 666, 669 (4th Cir. 1989)); *see Cook v. Colvin*, No. 2:13-CV-20573, 2015 WL 627856, at *16 (S.D.W. Va. Feb. 9, 2015) ("[W]ork history is one factor to examine when looking for deficits in adaptive functioning that manifested in the developmental period [...] Not only is the type of work performed by Claimant important, but his work record in general should be examined."); *Hancock,* 667 F.3d at 475–76 (The ALJ's consideration that Claimant worked several jobs, in addition to performing a variety of tasks, was sufficient evidence to support the ALJ's finding that the claimant did not have deficits in adaptive functioning; *Richardson v.*

*Colvin,* No. 8:12–cv–3507–JDA, 2014 WL 793069, at *12 (D.S.C. Feb. 25, 2014) ("[W]ork history, while it cannot preclude benefits where the Listing 12.05C criteria are otherwise met, ... can be relevant in determining whether a claimant manifested deficits in adaptive functioning").

In this case, the ALJ found at step two that Claimant had numerous severe impairments, including "borderline intellectual functioning." (Tr. at 13). At step three, the ALJ evaluated whether Claimant's impairment or combination of impairments met or medically equaled the criteria set forth in Listing 12.05. (Tr. at 14-15). As relevant to Claimant's challenge, the ALJ found that despite Claimant's IQ scores and his additional impairment imposing a significant work-related limitation of function, which together met the severity criteria of Listing 12.05C, Claimant did not satisfy the Listing, because he did not show "the requisite deficits in adaptive functioning initially manifested during the developmental period." (Tr. at 15). By way of explanation, the ALJ acknowledged that Claimant dropped out of high school, had poor grades and attendance, got into fights in school, and was "kicked out of school" on two occasions; but stated that, nonetheless, "no reference to special education" appeared in the record despite Claimant's allegations that he was in special education classes. (*Id.*). For that reason, the ALJ concluded that there was "little evidence" in the record to support a finding that Claimant met Listing 12.05C. (*Id.*).

The foregoing explanation is unsupported by substantial evidence and a wholly inadequate application of the law. To begin, Claimant's high school transcript plainly reflects that Claimant was in a "special education" mathematics course and a remedial English course in high school. (Tr. at 419). Notably, Claimant received a D and then failed his special education English course and received a D and C before failing his

remedial Mathematics course. (*Id.*). In the tenth grade, Claimant failed all of his classes and dropped out of high school. (*Id.*). Therefore, the sole basis provided by the ALJ for concluding that Claimant did not meet Listing 12.05C was factually inaccurate.

In addition, the ALJ's discussion of the relevant evidence concerning Claimant's adaptive functioning is entirely insufficient. Clearly, some evidence existed in the record that Claimant suffered from deficits in adaptive functioning that manifested during the developmental period. Indeed, the ALJ highlighted a few of those deficits in his short and conclusory Listing 12.05C discussion. However, other than noting these deficits, the ALJ never discussed or reconciled the evidence of Claimant's adaptive functioning anywhere else in the decision. For example, while the ALJ repeated some of Claimant's statements regarding his activities, the ALJ never examined Claimant's job duties, household activities, or social interactions and analyzed how those activities reflected on Claimant's alleged deficits of adaptive functioning. The ALJ never commented on Claimant's remedial and special education classes, or reconciled his poor grades with the finding of borderline intellectual functioning made by Ms. Jarrell. In fact, the ALJ failed to comment at all on the diagnosis of borderline intellectual functioning and never afforded any particular weight to the opinions of Ms. Jarrell. He provided no elaboration of any of his findings regarding Claimant's mental functional abilities and failed to meaningfully discuss Claimant's mental consultative examination. (Tr. at 14, 18-19).

In sum, the sole reason that the ALJ provided to support his conclusion that Claimant did not meet Listing 12.05C is contradicted by Claimant's high school transcript, which shows that Claimant received special education and remedial education. Moreover, even if the ALJ was correct in his belief that Claimant had no special education classes, there simply is no logical bridge between the statements in the

28

ALJ's Listing 12.05C discussion and his conclusion. Listing 12.05C *does not require* evidence of a special education background in order to prove deficits in adaptive functioning manifesting in the developmental period. Accordingly, the lack of a special education background does not, *ipso facto*, preclude a finding of disability under Listing 12.05C. Although the ALJ may be correct that Claimant does not have the requisite deficits in adaptive functioning required to meet Listing 12.05C, the Court cannot provide *post hoc* rationalization for the ALJ's decision, which the ALJ did not articulate himself, especially when compelling evidence likewise exists that Claimant potentially meets the listing. *Radford v. Colvin*, 734 F.3d 288, 296 (4th Cir. 2013) (The Court cannot "reweigh conflicting evidence, make credibility determinations, or substitute our judgment for that of the ALJ") (internal markings and citation omitted); *Fox v. Colvin*, 632 F. App'x 750, 755 (4th Cir. 2015) ("Our circuit precedent makes clear that it is not our role to speculate as to how the ALJ applied the law to its findings or to hypothesize the ALJ's justifications that would perhaps find support in the record.").

Accordingly, the undersigned **FINDS** that the case should be reversed and remanded so that the ALJ can assess all of the significant evidence pertaining to Claimant's intellectual impairment and compare it to the criteria of Listing 12.05C.

### B. RFC and Credibility Analysis

Claimant's remaining challenges to the Commissioner's decision focus on the ALJ's RFC analysis and are examined in turn below.

### 1. Omission of Medical Evidence

First, Claimant asserts that the ALJ omitted important medical evidence. As an example, Claimant states that the ALJ mentioned his November 2011 MRI, but failed to discuss that Claimant's herniated disc was "indenting the left side of the sac" and that

Claimant had a clinical history of paresthesias and radicular pain into his right leg. (ECF No. 12 at 7). While an ALJ must show that relevant evidence was considered and explain the basis for the ALJ's findings and decision, an ALJ is not required to explicitly comment on every detail of every piece of evidence in the record or restate Claimant's medical records verbatim. *Reid v. Comm'r of Soc. Sec.*, 769 F.3d 861, 865 (4th Cir. 2014). In fact, given the voluminous amount of records in this case and indeed nearly every social security case before an ALJ, it would be impossible to impose such a requirement.

The ALJ's decision demonstrates that the ALJ considered the medical evidence concerning Claimant's back condition, including Claimant's allegations, treatment, objective findings, diagnostic studies, and the opinion evidence regarding his functional abilities. (Tr. at 16-19). With respect to Claimant's November 2011 MRI, the ALJ explicitly considered the study, fully restating the interpreting radiologist's impression precisely as it was worded in the record. (Tr. at 16, 682). While the notation that Claimant's herniated disc was "indenting the left side of the sac," was included in the body of the findings, it was not stated in the radiologist's final impression. Accordingly, the ALJ obviously reviewed the record and properly relied on the radiology diagnosis. Furthermore, the ALJ specifically discussed Claimant's reported tenderness, range of motion in his spine, straight leg raising test results, and reflex and sensation examinations. (Tr. at 16-17). For instance, the ALJ noted Claimant's ability to heel and toe walk without evidence of weakness, squat without difficulty, and non-antalgic gait. (*Id.*). The ALJ considered that Claimant reported spasms in his back and pain in extremities. (Tr. at 17). After full consideration of the evidence, the ALJ reduced Claimant to a limited range of sedentary work. (Tr. at 15). Claimant fails to articulate how the ALJ's failure to mention a detailed finding in the body of the November 2011

MRI report negatively impacts the ALJ's ultimate decision or precludes meaningful review by this Court.

As to Claimant's next contention that the ALJ failed to mention or address his May 1, 2015 right knee MRI "at all," the ALJ very clearly referenced and considered this imaging study; thus, this challenge is likewise unavailing. (ECF No. 12 at 7); (Tr. at 17). Claimant further argues that the ALJ failed to mention Dr. Zahir's diagnosis of bilateral "internal derangement" of his knees and Dr. Zahir's notation during a visit on June 5, 2015 that if Claimant's knee problems continued, Dr. Zahir would consider surgery. (ECF No. 12 at 7-8). The undersigned does not find the ALJ's discussion of the medical evidence concerning Claimant's knee impairment to be misrepresentative of the record. The ALJ noted the objective findings of Claimant's examinations, his MRI results, and the history of his treatment, including injection therapy. (Tr. at 17-18). In regard to the June 2015 visit with Dr. Zahir, the ALJ specifically noted that the examination revealed full range of motion in Claimant's knees, minimal tenderness, no ligamentous laxity or effusion, and Dr. Zahir recommended that Claimant "simply ... wear a knee brace." (Tr. at 18, 770). Although Dr. Zahir mentioned that he "may consider" doing arthroscopy on Claimant's right knee "if Claimant continued to have problems," there was no subsequent indication in the record that surgery was considered, scheduled, or that any surgery occurred. (Tr. at 770). To the contrary, while Claimant continued to express complaints of knee pain and had crepitation on ranging of his knees, he walked with a non-antalgic gait, could heel and toe walk without difficulty and had no palpable effusion, symmetric range of motion, and normal strength on examination. (Tr. at 735-36). Therefore, the undersigned **FINDS** that the ALJ's discussion of the medical evidence was adequate and his alleged lack of discussion regarding the foregoing

notations does not warrant remand in this matter.

### 2. Assessment of Treatment

Claimant further argues that the ALJ's RFC assessment is flawed because the ALJ did not offer any support for his conclusions that Claimant had not received the type of treatment that one would expect for a totally disabled individual and that Claimant's treatment was conservative, routine, and generally successful in controlling his symptoms. (ECF No. 12 at 10).

After referencing portions of the medical evidence, the ALJ ultimately concluded that:

> The claimant has not generally received the type of medical treatment one would expect for a totally disabled individual. The treatment the claimant has received has been essentially routine and/or conservative in nature and generally successful in controlling his symptoms. Additionally, MRI reports of the lumbar spine and right knee had minimal findings. Examinations revealed the claimant was doing well and surgery has not been recommended.

(Tr. at 19).

The undersigned finds that the decision itself explains the basis of the ALJ's above conclusions. The ALJ noted that Claimant's back pain was treated only with medication. For his knee pain, Claimant again received routine and conservative treatment consisting of medication, periodic injections, and a knee brace. (Tr. at 17). Further, the ALJ cited that Claimant's follow-up treatment note with Dr. Rahim in December 2014 confirmed that Claimant was "doing much better" in terms of back pain since a muscle relaxant was added to his medication regimen. (*Id.*). The ALJ also cited the results of Claimant's physical examinations in 2014 and 2015, indicating that Claimant could squat without difficulty, had a full range of motion in his lumbar spine and knees, could heel and toe walk, and had a non-antalgic gait, among other objective findings. (Tr. at

16-18). As to Claimant's right elbow pain, the ALJ noted that Claimant was doing "really well" following his synovectomy and release surgery in January 2014, reporting that his deep pain was gone, and he had full range of motion except for 10 degrees of full extension. (Tr. at 17). The ALJ also discussed the evidence concerning Claimant carpal tunnel syndrome and cited that his follow-up treatment notes after his release surgeries indicated that he was "doing well." (*Id.*).

Based upon the above, the undersigned **FINDS** that the ALJ articulated adequate support for his conclusions that Claimant's treatment had been essentially routine/conservative, generally successful in controlling his symptoms, and not that of what would be expected of a totally disabled individual. Claimant was treated by medications and injections for his back and knee impairments. Notwithstanding Claimant's elbow and carpal tunnel release surgeries, which the ALJ noted to be successful, there is no indication that Claimant has been recommended for knee or back surgery. Dr. Zahir mentioned in June 2015 that he would consider knee arthroscopy, "if [Claimant] continued to have problems." (Tr. at 770). However, there are no further records to indicate that Claimant's symptoms or conditions worsened to the point that surgery was even considered. Overall, while Claimant may have a different interpretation of his medical history, there is more than a scintilla of evidence to support the ALJ's conclusions as to the nature of Claimant's treatment.

### 3. Dr. Kropac's Opinion

Claimant next argues that the ALJ did not explain or provide support for his rejection of Dr. Kropac's opinion that Claimant could stand for less than two hours and sit for less than six hours in an eight-hour work day. When evaluating a claimant's application for benefits, the ALJ "will always consider the medical opinions in [the] case

record together with the rest of the relevant evidence [he] receives." 20 C.F.R. §§ 404.1527(b), 416.927(b). Medical opinions are defined as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [his] symptoms, diagnosis and prognosis, what [he] can still do despite [his] impairment(s), and [his] physical or mental restrictions." *Id.* §§ 404.1527(a)(2), 416.927(a)(2). The regulations outline how the opinions of accepted medical sources will be weighed in determining whether a claimant qualifies for disability benefits. In general, an ALJ should allocate more weight to the opinion of an examining medical source than to the opinion of a non-examining source. *Id.* §§ 404.1527(c)(1), 416.927(c)(1). Even greater weight should be given to the opinion of a treating physician, because that physician is usually most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. *Id.* §§ 404.1527(c)(2), 416.927(c)(2). Indeed, a treating physician's opinion should be given ***controlling*** weight when the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence. *Id.*

If the ALJ determines that a treating physician's opinion is not entitled to controlling weight, the ALJ must then analyze and weigh all the medical opinions of record, taking into account certain factors listed in 20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6),[4] and must explain the reasons for the weight given to the opinions. "Adjudicators must remember that a finding that a treating source medical opinion is

---

[4] The factors include: (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) other factors bearing on the weight of the opinion.

not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected ... In many cases, a treating source's opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." SSR 96-2p, 1996 WL 374188, at *4. Nevertheless, in appropriate circumstances, a treating physician's opinion may be rejected in whole or in part in favor of a conflicting opinion by a non-treating source; for example, when the non-treating source's opinion is well-supported by evidence and explanation, is more consistent with the record as a whole, and is offered by a source with specialization in the subject matter of the opinion. *See Brown v. Commissioner of Soc. Sec.*, 873 F.3d 251, 268 (4th Cir. 2017). Ultimately, it is the responsibility of the ALJ, not the court, to evaluate the case, make findings of fact, weigh opinions, and resolve conflicts of evidence. *Hays*, 907 F.2d at 1456.[5]

Medical source statements on issues reserved to the Commissioner are treated differently than other medical source opinions. SSR 96-5p, 1996 WL 374183. In both the regulations and SSR 96-5p, the SSA explains that "some issues are not medical issues regarding the nature and severity of an individual's impairment(s) but are

---

[5] Although 20 C.F.R. §§ 404.1527(c), ), 416.927(c) provide that in the absence of a controlling opinion by a treating physician, all of the medical opinions must be evaluated and weighed based upon various factors, the regulations do not explicitly require the ALJ to recount the details of that analysis in the written opinion. Instead, the regulations mandate only that the ALJ give "good reasons" in the decision for the weight ultimately allocated to medical source opinions. *Id.* §§ 404.1527(c)(2), ), 416.927(c)(2); *see also* SSR 96-2p, 1996 WL 374188, at *5 ("the notice of the determination or decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight."). "[W]hile the ALJ also has a duty to 'consider' each of the ... factors listed above, that does not mean that the ALJ has a duty to discuss them when giving 'good reasons.' Stated differently, the regulations require the ALJ to consider the ... factors, but do not demand that the ALJ explicitly discuss each of the factors." *Hardy v. Colvin,* No. 2:13–cv–20749, 2014 WL 4929464, at *2 (S.D.W. Va. Sept. 30, 2014).

administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability," including the following:

> 1. Whether an individual's impairment(s) meets or is equivalent in severity to the requirements of any impairment(s) in the listings;
>
> 2. What an individual's RFC is;
>
> 3. Whether an individual's RFC prevents him or her from doing past relevant work;
>
> 4. How the vocational factors of age, education, and work experience apply; and
>
> 5. Whether an individual is "disabled" under the Act.

*Id.* at *2. "The regulations provide that the final responsibility for deciding issues such as these is reserved to the Commissioner." *Id.* Consequently, a medical source statement on an issue reserved to the Commissioner is never entitled to controlling weight or special significance, because "giving controlling weight to such opinions would, in effect, confer upon the [medical] source the authority to make the determination or decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine when an individual is disabled." *Id.* at *2. Still, these opinions must always be carefully considered, "must never be ignored," and should be assessed for their supportability and consistency with the record as a whole. *Id.* at *3.

In this case, Claimant's treating orthopedic surgeon, Dr. Kropac, opined on August 19, 2015 that Claimant could stand or walk for less than two hours and sit for less than six hours in an eight-hour workday. (Tr. at 773). The ALJ rejected these limitations on the basis that they were not supported by "the evidence." (Tr. at 18). The ALJ did not elaborate on what he meant by "the evidence" when addressing Dr. Kropac's opinions;

however, later in the decision, he stated that Claimant had not received the "type of treatment one would expect for a totally disabled individual." (Tr. at 19). The ALJ indicated that Claimant's treatment had been "routine and/or conservative in nature and generally successful in controlling his symptoms," "MRI reports of the lumbar spine and right knee had minimal findings," "[e]xaminations revealed that claimant was doing well and surgery [had] not been recommended." (Tr. at 19). While this explanation might bear on Dr. Kropac's opinions in the sense that Dr. Kropac cited Claimant's low back, extremity, and knee pain to support his assessment, (Tr. at 773), the ALJ never tied these findings in any meaningful way to Dr. Kropac's opinions.

Therefore, in order to find substantial evidence, the Court would be left to guess which parts of the record guided the ALJ's conclusion that Claimant's ability to sit and stand/walk exceeded Dr. Kropac's opinion. The ALJ's lack of explanation for discounting Dr. Kropac's opinion is particularly critical in this case for two reasons. First, as Claimant points out, the ALJ also discounted the only other medical source opinions bearing on Claimant's physical RFC. (Tr. at 19). The non-examining state experts found that Claimant could stand, walk, or sit for six hours each in an eight-hour workday. (Tr. at 105, 134). The ALJ gave little weight to these findings, stating that the medical evidence subsequent to such RFC determinations showed that Claimant was "somewhat more limited than was previously determined." (Tr. at 19).

Second, Claimant's RFC was for less than a full range of sedentary work. As the SSA explains in SSR 96-9p, "[a]n RFC for less than a full range of sedentary work reflects very serious limitations resulting from an individual's medical impairment(s) and is expected to be relatively rare." 1996 WL 374185, at *1 (S.S.A. Jul. 2, 1996). "The impact of an RFC for less than a full range of sedentary work is especially critical for individuals

who have not yet attained age 50. Since age, education, and work experience are not usually significant factors in limiting the ability of individuals under age 50 to make an adjustment to other work, the conclusion whether such individuals who are limited to less than the full range of sedentary work are disabled will depend primarily on the nature and extent of their functional limitations or restrictions." *Id.* at *2. Consequently, "an accurate accounting of an individual's abilities, limitations, and restrictions is necessary to determine the extent of erosion of the occupational base [and] the types of sedentary occupations an individual might still be able to do."

Here, as stated in the written decision, the ALJ concluded that Claimant was more limited than the state agency experts assessed, but less limited than Dr. Kropac's assessment. While the ALJ's conclusion may be supported by substantial evidence and it is certainly within the province of the ALJ to assess a Claimant's RFC, the ALJ is obligated to articulate the basis for his conclusions. Otherwise, the Court cannot meaningfully review the ALJ's decision. When an ALJ repeatedly refers to "the evidence" that guides his conclusions without any specific references or citations to the record and the decision does not otherwise explain the basis for the ALJ's findings, the matter must be remanded for additional consideration. Therefore, the undersigned **FINDS** that on remand, the ALJ should also reconsider, elaborate upon, and/or explain his rejection of Dr. Kropac's opinion regarding Claimant's ability to sit and stand/walk.

### 4. Moderate Restriction in Concentration, Persistence, or Pace

Claimant further argues that the ALJ's RFC determination and ultimate decision that he was not disabled is unsupported by substantial evidence because the ALJ failed to account for his moderate difficulties in maintaining concentration, persistence, or pace. (ECF No. 12 at 12). Claimant notes that the only mental limitations imposed by the

ALJ involved reducing Claimant's decision-making, changes in the work setting, and interaction with the public or coworkers to "occasional" occurrences. Claimant contends that, when applied to deficits in concentration, persistence or pace, these restrictions make even less sense than the restriction to simple tasks or unskilled work that the Fourth Circuit rejected in *Mascio v. Colvin*, 780 F.3d 632 (4th Cir. 2015). (*Id.* at 12-13). Claimant argues that the ALJ failed to explain how such limitations addressed Claimant's tendency to be off task due to problems with concentration, persistence, or pace. Moreover, the ALJ did not explain why further limitations were unnecessary. (*Id.*).

At step two the ALJ assessed that Claimant had moderate difficulty maintaining concentration, persistence, or pace. (Tr. at 14). The ALJ noted the results of Claimant's March 2013 mental consultative examination, which included, *inter alia*, Dr. Jarrell's findings that Claimant's concentration was moderately deficient, his pace was mildly to moderately slow, and his persistence was mildly deficient. (Tr. at 18). The ALJ ultimately reduced Claimant to a low-stress job with only occasional interaction with the public or co-workers. (Tr. at 15).

When a moderate limitation in maintaining concentration, persistence, or pace is found to exist by an ALJ, the ALJ must explain how that limitation is addressed by the RFC finding, or why the limitation does not require an additional restriction in the RFC finding. *Mascio*, 780 F.3d at 637-38. The ALJ failed to provide such an explanation in this case. In fact, the ALJ failed to provide any substantive analysis of Claimant's concentration, persistence, or pace in the RFC discussion. The consultative examiner, state agency experts, and ALJ unanimously agreed that Claimant had moderate difficulty maintaining concentration. (Tr. at 15, 103, 132, 692). The agency experts found that Claimant had a limited capacity for concentration/persistence such that he should

avoid tasks that required sustained attention to detail and he was also probably best suited working with things, rather than people due to his alleged social issues. (Tr. at 108, 136-37). While the state agency experts' findings may explain the assessed social limitation in Claimant's RFC, the ALJ did not apply any of this evidence to his RFC finding or explain the basis for his assessment that Claimant's RFC was only limited to low-stress jobs with occasional social interaction.

The ALJ was obligated to identify Claimant's functional limitations and assess his work-related abilities on a function-by-function basis to determine his RFC. *See* SSR 96-8p. This evaluation required the ALJ to review Claimant's mental abilities such as the capacity to understand, remember, and carry out instructions; respond appropriately to supervision, co-workers, and others; adapt to pressures and changes in a work setting; and stay on task without interruption from psychological issues. SSR 96-8p; 20 C.F.R. §§ 404.1545, 416.945. The ALJ did not articulate an analysis of Claimant's mental functional abilities or the limitations that flowed from his various impairments.

Undoubtedly, the ALJ may have found that Claimant's moderate limitations did not require further mental restrictions in Claimant's RFC. However, because the ALJ's decision lacks such critical explanation, the Court cannot meaningfully review whether the RFC finding is supported by substantial evidence. Furthermore, the undersigned cannot conclude that the ALJ's foregoing errors were harmless. The unskilled sedentary jobs used to support the ALJ's step five finding (assembler, table worker, and stuffer) require some degree of sustained concentration, persistence, or pace. The vocational expert testified that those jobs could *not* be performed by a person with Claimant's characteristics and RFC, if the person was off task more than ten percent of the day and, in fact, being off task ten percent or more of the day would eliminate the person from

performing "all jobs." (Tr. at 64). Clearly, a limitation in concentration, persistence, or pace would directly affect Claimant's ability to perform the jobs identified by the ALJ at step five and his ability to perform any jobs at all. Therefore, the undersigned **FINDS** that this matter must additionally be remanded for the ALJ to reconsider or elaborate upon his RFC assessment concerning Claimant's moderate difficulty in maintaining concentration, persistence, or pace.

### 5. Credibility Analysis

Finally, Claimant challenges the Commissioner's decision on the basis that the ALJ failed to analyze his "non-medical evidence/daily activities." (ECF No. 12 at 8). In the decision, the ALJ acknowledged Claimant's allegations that he could not lift anything or walk or stand for very long and that all that he did was stay in the house. (Tr. at 16). Moreover, the ALJ cited Claimant's statements that he required assistance from his wife to care for the animals and children and could not bend down to tie his shoes; however, he could take care of his personal needs, drive, pay bills, count change, and spend time with his children. (*Id.*). Yet, regarding such evidence, the ALJ merely provided the following elusive statement:

> Although the claimant has described daily activities that are limited, two factors weigh against considering these allegation to be strong evidence in favor of finding the claimant disabled. First, allegedly limited daily activities cannot be objectively verified with any reasonable degree of certainty. Secondly, even if the claimant's daily activities are truly as limited as alleged, it is difficult to attribute that degree of limitation to the claimant's medical condition, as opposed to other reasons, in view of the relatively weak medical evidence and other factors discussed in the decision. Overall, the claimant's reported limited daily activities are considered to be outweighed by the other factors discussed in the decision.

(Tr. at 19).

The above explanation lacks any meaningful discussion of Claimant's alleged

limitations in daily activities in comparison with the other evidence. In short shrift, the ALJ dismissed Claimant's allegations on the basis that they cannot be objectively verified, which would most always be the case when a claimant alleges disability, and the ALJ then invites the reviewer to parse through the decision in search of the ALJ's rationale underlying his credibility determination. A review of the decision does not reveal any analysis of Claimant's daily activities/non-medical evidence. At step three of the sequential evaluation, the ALJ concluded, without any explanation, that Claimant had only mild restriction in activities of daily living. (Tr. at 14). Then, while the ALJ acknowledged Claimant's allegations and provided a recitation of the medical evidence that he found to be most relevant, he did not piece any of the information together in assessing Claimant's credibility and RFC.

Under the Social Security rulings and regulations, an ALJ is obliged to use a two-step process when evaluating the credibility of a claimant's subjective statements regarding the effects of his or her symptoms. 20 C.F.R. §§ 404.1529, 416.929. Once an ALJ concludes that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms, as the ALJ found in this case, the ALJ must evaluate the intensity, persistence, and severity of the symptoms to determine the extent to which they prevent the claimant from performing basic work activities. *Id.* §§ 404.1529(a), 416.929(a). In evaluating the credibility of a claimant's statements, the ALJ must consider "all of the relevant evidence," including: the claimant's history; objective medical findings obtained from medically acceptable clinical and laboratory diagnostic techniques; statements from the claimant, treating sources, and non-treating sources; and any other evidence relevant to the claimant's symptoms, such as, evidence of the claimant's daily activities, specific descriptions of symptoms (location, duration,

42

frequency and intensity), precipitating and aggravating factors, medication or medical treatment and resulting side effects received to alleviate symptoms, and other factors relating to functional limitations and restrictions due to the claimant's symptoms. *Id.* §§ 404.1529(c)(1)-(3), 416.929(c)(1)-(3); *see also Craig*, 76 F.3d at 595; SSA 96-7P, 1996 WL 374186, at *4-5. In reviewing the record for substantial evidence, the Court does not re-weigh conflicting evidence, reach independent determinations as to credibility, or substitute its own judgment for that of the Commissioner. *Hays*, 907 F.2d at 1456.

In addition, "Social Security Ruling 96-8p explains that the RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *Monroe v. Colvin*, 826 F.3d 176, 189 (4th Cir. 2016) (internal markings and citations omitted). An ALJ "must build an accurate and logical bridge from the evidence to his conclusion;" as stated by United States Court of Appeals for the Fourth Circuit, "a necessary predicate to engaging in substantial evidence review is a record of the basis for the ALJ's ruling, including "a discussion of which evidence the ALJ found credible and why, and specific application of the pertinent legal requirements to the record evidence." *Id.* (citing *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000) and *Radford v. Colvin*, 734 F.3d 288, 295 (4th Cir. 2013)).

Therefore, while the record may very well cast doubt on Claimant's alleged limitations, the Court cannot supply reasons to support the credibility determination or substitute its analysis for that of the ALJ. The ALJ contends that Claimant's alleged limitations are not credible because they cannot be verified and, even if they are accurate, they are not likely attributed to Claimant's medical conditions as opposed to "other factors" in light of the "weak medical evidence and other factors discussed in this

decision." (Tr. at 19). The ALJ does not cite to any evidence that informs his conclusions, nor does the ALJ explain the "other factors" to which the ALJ attributes Claimant's alleged symptoms and limitations.

Therefore, the undersigned **FINDS** the case should additionally be reversed and remanded so that the ALJ can adequately explain his findings and conclusion as to Claimant's credibility.

## VIII.  <u>Recommendations for Disposition</u>

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the presiding District Judge confirm and accept the findings herein and **RECOMMENDS** that the District Judge **GRANT** Plaintiff's request for judgment on the pleadings, (ECF Nos. 11, 12), to the extent that it requests remand of the Commissioner's decision; **DENY** Defendant's request to affirm the decision of the Commissioner, (ECF No. 15); **REVERSE** the final decision of the Commissioner; **REMAND** this matter pursuant to sentence four of 42 U.S.C. § 405(g) for further administrative proceedings consistent with this PF&R; and **DISMISS** this action from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable David A. Faber, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (if received by mail) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis

of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown. Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Judge and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Faber, and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED:** May 25, 2018

Cheryl A. Eifert
United States Magistrate Judge